Argued and submitted October 8, 2003, affirmed May 12, 2004

In the Matter of the Conservatorship of
Sadie A. Grimmett.

Sadie A. GRIMMETT,
*Appellant,*

*v.*

Cynthia BROOKS,
*Respondent.*

0008-91312; A117431

89 P3d 1238

Vernon Cook argued the cause and filed the briefs for appellant.

Cynthia L. Barrett argued the cause and filed the brief for respondent.

Before Edmonds, Presiding Judge, and Wollheim and Schuman, Judges.

WOLLHEIM, J.

**WOLLHEIM, J.**

This case arises from an order of the probate court appointing respondent as conservator. We review *de novo*, ORS 19.415(3) (2001),[1] and agree with the probate court that appellant requires a conservator and that respondent is the most suitable person to serve as conservator. We also hold that the probate court did not err when it denied appellant's motion to dismiss based on failure to state a claim or lack of subject matter jurisdiction. We begin our analysis with the facts of this case, which are extensive.

In the summer of 2000, appellant Sadie Grimmett moved to Portland from Indiana, where she had been working as a college psychology professor. Grimmett moved to Portland at the urging of her goddaughter, respondent Cynthia Brooks, an attorney. Brooks helped Grimmett find, and move into, an apartment at West Hills Village (West Hills), a Portland residential care facility. West Hills administers Grimmett's medication but does not provide her with extensive care.

Steven SeRine, Grimmett's financial advisor in Indiana, assisted Grimmett with financial planning and, earlier in 2000, had assisted Grimmett with her estate planning. SeRine testified that, with the exception of a token amount going to one of Grimmett's relatives, Brooks was the sole beneficiary of Grimmett's estate. SeRine explained that Grimmett always spoke of Brooks

"in great favor and she trusted [Brooks], to the extent where [Grimmett] wanted [Brooks] not only to be her successor trustee but also her power of attorney for financial and healthcare issues as well as her guardian and also her conservator as well as her beneficiary, which [Brooks] did not know any of this as far as * * * the estate is concerned * * * because [Brooks] lived in Portland and [Grimmett] was out here in Indiana."

---

[1] In 2003, the legislature amended ORS 19.415(3). The judgment in this case, however, was entered before the effective date of the change. *See* Or Laws 2003, ch 576, §§ 88, 90a.

SeRine also said that Grimmett moved over $324,000 into a tax shelter annuity and listed Brooks "as the beneficiary of that particular money * * *."

SeRine testified that, soon after Grimmett set up her trust, she began to "slip." He explained that Grimmett's

"memory was not good and she * * * was not keeping care of herself, and I suggested that she have somebody come in and be with her and she * * * called * * * and asked if [Brooks] would come out, and once [Brooks] saw that there was concern she got on a plane and came right out."

SeRine said that he spoke with Brooks and encouraged her to come to Indiana because Grimmett was not paying her bills. SeRine described Brooks as "very professional, very businesslike" and said that when he set up a meeting between Grimmett, Brooks, and himself, Brooks had already "gone ahead and done some of the things that needed to be done." Specifically, SeRine said that Brooks

"went to the doctor and she made sure that her credentials [under the terms of Grimmett's estate plan] were taken care of. She went down to get the house [payments] current * * * I was quite impressed. I went home and told my wife * * * 'If I ever get sick, I hope that somebody takes care of me the way that [Brooks] takes care of [Grimmett].' "

SeRine said that he "would recommend that [Brooks] be in charge because * * * I know how [Grimmett] felt about her before [Grimmett] got sick."

Brooks testified that she went to Indiana

"three times and managed [Grimmett's] financial affairs, took her to the doctor's office where she had missed appointments * * * got her hair done, bought her clothes, straightened out all of her financial business, and there was a lot of straightening out to do. I * * * got her retirement started. I took her to the bank. I took her to the attorney. I arranged for her house to be sold. I packed her house, her entire house. I arranged for someone to stay with her. I did a lot of work, and [Grimmett] knew that I had done a lot for her."

Brooks testified that she spoke with Grimmett's physician, who said that Grimmett

"was suffering from two major issues[:] alcoholism and dementia, and her physician didn't know what degree was the dementia and what degree * * * was the alcoholism,

and [the physician] felt that if [Grimmett] did not drink, [Grimmett] might very well be capable of handling her own affairs."

Sometime around August 2000, after Brooks had helped Grimmett move to Portland, Grimmett began to object to Brooks's assistance. Brooks said that she

"located a clinic and a physician so that [Grimmett] could establish her medical care here in Portland. * * * I pulled the nurse aside, and I told the nurse that [Grimmett] was— had continued to drink, and for awhile she had stopped, but she had started back drinking again, and that she did have a car and she was driving and that the physician needed to know this."

Brooks said that she told the nurse about Grimmett's drinking "[b]ecause I was told by the head nurse at [West Hills] to let the physician to know * * * because everyone was concerned about her safety and the safety of others." Brooks said that, when Grimmett saw the physician, the physician told Grimmett that Brooks was concerned about Grimmett's alcohol consumption and, at that point, Grimmett became upset with Brooks. Brooks also said that Grimmett was angry with her due to "a combination of things that happened around the same period of time." Brooks said that Truman Wimberly, a long-time friend of Grimmett's,

"found out that [Grimmett] was in town, and he immediately made contact and began seeing her and staying with her on a frequent basis, and I believe that there was some influence there.

"And then * * * I came to get [Grimmett] * * * a day or two after the visit with the physician, to take her to a play. I had taken her to a couple of theater plays * * * because I knew that she liked theater, and I came to get her, and she was quite intoxicated and wasn't ready to go and didn't want to go. The next morning I was called by [West Hills], and they stated that * * * they had found her naked on the floor, passed out. * * *

"Now, * * * I don't know what may have happened to her from a physical standpoint, but after that happened * * * and her contact with [Wimberly], she became very, very angry with me, began to swear at me, demanding things, where we had a good relationship up until that point."

At the conservatorship hearing, Wimberly conceded that, although he spends the majority of his nights with Grimmett at Grimmett's residence, he does not contribute to her rent payments. Grimmett said that Wimberly also drives her car "because he's got an Oregon Driver's License" and because "I haven't been able to pass the paper thing."

Wimberly testified that, if Grimmett asks him to, he helps her write her checks and deliver them to the proper address. Wimberly also said that he helps remind Grimmett when she forgets things, and that he takes her to the liquor store occasionally "where she purchases alcohol."

In April 2000, Brooks obtained letters from two physicians stating that Grimmett was not capable of handling her own affairs and, on August 8, 2000, Brooks filed a petition to be appointed as Grimmett's guardian, but the court visitor determined that a guardianship was not necessary. On October 19, 2000, Brooks amended her guardianship petition, adding a request for appointment as Grimmett's conservator and withdrawing her petition for guardianship.

It is undisputed that, now, Grimmett does not want Brooks to serve as her conservator. At the conservatorship hearing, Grimmett spoke unfavorably of Brooks. When Grimmett was asked whether she lived in the Portland area, Grimmett replied, "I have lived in the Portland area, and I discovered that [Brooks] is an awful person." Grimmett also testified that Brooks "stole $30,000" of the proceeds from the sale of Grimmett's house in Indiana. Grimmett acknowledged, however, that she came to Oregon to be with Brooks "almost every Christmas" and that Brooks flew to Indiana occasionally to visit with Grimmett. Grimmett said that she will accept assistance with her affairs only from her friend, Ella Bernice Davis, and Wimberly.

Since coming to Portland, Grimmett has revised her annuity documents so that Brooks is no longer the beneficiary. Grimmett has also executed a new power of attorney, revoking Brooks's power of attorney and giving power of attorney to Davis. Furthermore, Grimmett executed a new revocable living trust, replacing Brooks with Davis as the successor trustee and naming Grimmett's cousins and the University of Oregon as beneficiaries of her estate, in place of Brooks.

One of the main issues surrounding this litigation concerns a transfer of stock from Grimmett to Brooks. Before Grimmett moved to Portland, SeRine spoke with Brooks and Grimmett and recommended that, once in Portland, Grimmett liquidate her shares of Old National Bancorp stock, worth approximately $40,000, through an Oregon broker. On June 9, 2000, however, Grimmett transferred the stock to Brooks, who explained that Grimmett's transfer of stock was "clearly" a gift that was given to Brooks at a time when Grimmett "had not been drinking * * *." The gift of stock was documented in both Brooks's and Grimmett's tax returns.

At the conservatorship hearing, Grimmett said that she did not remember giving the stock to Brooks, "but that doesn't mean that I didn't give it to her." When Grimmett was asked whether she remembered if her tax forms that documented a gift of stock to Brooks were sent to the IRS, Grimmett said, "It was sent in. I sent it in." During subsequent questioning at the continuation of the conservatorship hearing in January 2002, however, Grimmett denied giving the stock to Brooks.

Despite Grimmett's ill will toward her and the dispute regarding the stock transfer, Brooks testified that she knows of no one, with the exception of herself, who is capable of assisting Grimmett. Brooks testified that Grimmett does not have a relative who could assist with Grimmett's care. Brooks explained that, after Grimmett became angry with her, Brooks spoke with Grimmett's cousin and explained the situation to the cousin, but the cousin said she did not want to help care for Grimmett. Brooks testified that she has used a certified public accountant to assist her with Grimmett's finances and that, if appointed conservator, she would continue to do so. Brooks explained:

> "[Grimmett's] business has not been handled properly since I was actively handling it. No one put in a change of address. All her bills—her insurance checks to pay her rent have been continuously coming to my address all this time. I've got a check to pay her rent now. So nobody is on top of her financial affairs but me."

Besides Brooks's testimony regarding Grimmett's incapacity, two people at West Hills—Carey Cullen, a nurse

and administrator, along with a woman who served as the director of nursing—were concerned enough about Grimmett to recommended that a guardianship be instituted for her. At the conservatorship hearing, Cullen said that "there has been a strong odor of alcohol in the apartment" and described an incident at West Hills where she knocked on the door to Grimmett's apartment

> "and when I didn't have an answer I cracked the door and said, 'Hello,' and I came in, and [Grimmett] was in the bed, apparently inebriated, acting confused, acting kind of wild, talking about her dog that had been taken away from her and how she wanted to get another dog and just went on about stuff that really didn't make any sense * * *."

Cullen prepared a service plan assessment form for Grimmett in August 2001, stating that, due to Grimmett's alcohol abuse, Grimmett requires a verbal reminder and supervision in the event of an emergency evacuation or fire drill, as well as staff guidance to assist Grimmett with making her decisions. The report stated that, because of her alcohol abuse, Grimmett becomes confused and has trouble making good decisions. The report also said that Grimmett has "difficulty ambulating due to frequent inebriation."[2] Cullen said that Grimmett is socially withdrawn and that her only connection is with Wimberly, who helps Grimmett with making decisions and performing day-to-day tasks.

Regarding Grimmett's medical care, Cullen's report stated that Grimmett needs assistance with her medical appointments and requires verbal reminders for the self-administration of her medication but that Grimmett refuses to take her medications when they are offered. Cullen testified that, for a few months, Grimmett has refused all of her medications. Cullen also said that Grimmett "has been known to hide her cups of pills in her room and to put them in her mouth and hold them in her cheek until we exit the room."

---

[2] At the conservatorship hearing, Cullen testified:

"Under [Grimmett's] mobility, we help her with her ambulation occasionally, because of her [alcohol] abuse and frequent inebriation * * *. I might say occasion[al] inebriation.

"[COUNSEL]: You said 'frequent.'

"[CULLEN]: Right."

Furthermore, Cullen said that Grimmett is forgetful. Specifically, in August 2001, Grimmett left her stove on with a pot on one of the burners, which caused so much smoke that the fire department had to be called. Pursuant to a request by the fire department, West Hills turned Grimmett's stove off. After this event, Cullen said that Grimmett approached her and said that she wanted her stove turned back on. Cullen said that she reminded Grimmett that the stove was turned off at the recommendation of the fire department, but Grimmett could not recall that recommendation or the incident itself. Cullen also said that Grimmett has a pattern of writing checks to West Hills for insufficient funds. At one point, Grimmett wrote a check to West Hills for insufficient funds and when West Hills gave Grimmett her check back, she wrote West Hills a new check—that time for a million dollars.

Grimmett's forgetfulness was also exhibited at the conservatorship hearing, where she was unable to recall the year that she retired. Grimmett also could not recall the name of the university where she received her master's degree, stating, "Maybe it didn't have a name." Additionally, Grimmett could not remember any of the estate planning that she had done with SeRine and, when asked if she knew who SeRine was, she replied:

"[GRIMMITT]: He said I did.

"[COUNSEL]: Uh-huh.

"[GRIMMETT]: So I guess I do."

Grimmett also had difficulty recalling the name of her assisted living residence, saying, "I live in the old folks home[,]" and "I think it's called West Hills."

Grimmett was further confused when she was asked more specifically about her estate planning documents. When Grimmett was asked who she thought she could rely on in the case of illness, Grimmett answered, "Well, it certainly wasn't [Brooks]." Subsequently, Grimmett acknowledged that she may have named Brooks in her estate planning documents, but "it wasn't because I thought [Brooks] was going to be good." When asked whether she had someone in mind who might be "good to name," Grimmett said, "Oh, I

can't think of her name now, the person from Cincinnati who has been at my house."

Furthermore, Grimmett's most recent power of attorney documents refer to her friend Davis as Bernice Banks, despite the fact that Davis's name is Ella Bernice Davis. When Davis was asked about this inconsistency, she explained that Banks is her maiden name, that she has gone by Davis since she was married in 1972 but that Grimmett remembered Davis as Bernice Banks and must not have known Davis's married name.

Davis said that Grimmett needs help managing her financial affairs, specifically "in writing her checks and * * * balancing her checkbook, checking to see where her money is and how much there is and things like that. She needs help in her apartment, also." Davis said that Grimmett has needed such help since the summer of 2000.

At the conservatorship hearing, Grimmett acknowledged that she "can't keep up with money." Also at the conservatorship hearing, SeRine detailed Grimmett's assets and explained that Grimmett receives a monthly income from the university where she taught and social security payments. However, Grimmett did not remember that she receives social security payments, stating, "I don't know that I get a social security check. I somehow don't think that I do, but I probably should be." SeRine also said that Grimmett has long-term care insurance to pay for her assisted living. However, when Grimmett was asked whether she has long-term care insurance, she stated, "Not that I know of." When asked whether she receives a long-term care insurance check to pay West Hills, Grimmett replied, "What do they say?" At that point, counsel for respondent showed Grimmett the check that was issued to West Hills by Grimmett's long-term care insurance company. Grimmett responded by saying that she had never seen "anything like this because I don't ever remember getting anything from Conseco Senior Health Insurance Company." When Grimmett was asked whether she had applied for long-term care insurance, she said, "I didn't apply for it. I'm saying to you I've not ever seen it, as far as I know." Grimmett also said, "I don't recall discussing a check with West Hills or with the company who delivered them. See, I don't recognize the company." Grimmett also did

not remember signing her original power of attorney for health care form that was witnessed by SeRine and, when shown a copy of it, she said, "[I]t doesn't appear to be my signature."

Furthermore, Grimmett could not recall the names of the banks where she keeps her money, whether she has any investments, whether she receives a monthly check from the university where she taught, the amount of her monthly retirement check, or whether she received any other bills. When asked how she received her bill from West Hills, she replied, "I don't know. I think they put it in the boxes. We have mailboxes." Grimmett also did not remember that her accounts are held in a living trust and said, "I think they're just held as bank accounts."

Ultimately, the probate court found that there was evidence that "[r]espondent is financially incapable [and] has financial resources that require management and protection[.]" The probate court appointed Brooks as conservator and stated, in its oral decision:

> "The evidence is indeed clear and convincing, both verbal and nonverbal body language and communication, that [Grimmett] needs a conservator. There's no question in my mind about that. Any reliance on [Wimberly], the fellow who testified here * * * will be misplaced, by my observation, of what the heck has gone on in this case."

Grimmett appeals and makes three assignments of error. She argues that (1) the probate court erred when it denied her motion to dismiss for failure to state a claim or cause of action; (2) Brooks failed to prove that Grimmett was financially incapable by clear and convincing evidence; and (3) the probate court abused its discretion when it "failed to take into account the wishes of [Grimmett] in the appointment of a conservator[.]" We begin by addressing Grimmett's first assignment of error.

██ Before the presentation of any evidence, Grimmett made a motion to dismiss for failure to state a claim or cause of action, arguing that Brooks's petition did not comply with ORS 125.055.[3] Specifically, Grimmett argues:

_____

[3] Grimmett also argues that failure to state a claim is a jurisdictional issue that may be raised for the first time on appeal. However, the Supreme Court has

"ORS 125.055(2)[4] and [ORS 125.055](4)[5] set forth eleven separate categories of information that must be contained in the petition for conservatorship. [Brooks] fully complied with only three of those categories: (1) She stated the type of fiduciary appointment she was seeking;

rejected that argument. *See Waddill v. Anchor Hocking, Inc.,* 330 Or 376, 384, 8 P3d 200 (2000), *adh'd to on recons,* 331 Or 595, 18 P3d 1096 (2001) ("Oregon appellate courts will not consider on appeal the legal sufficiency of a claim unless a defense on that basis was raised to the trial court before or during the trial on the merits in the manner prescribed by ORCP 21 G(3).").

[4] ORS 125.055(2) provides, in part:

"A petition in a protective proceeding must contain the following information to the extent that the petitioner is aware of the information or to the extent that the petitioner is able to acquire the information with reasonable effort:

"(a) The name, age, residence address and current location of the respondent.

"(b) The interest of the petitioner.

"(c) The name, age and address of the petitioner and any person nominated as fiduciary in the petition and the relationship of the nominated person to the respondent.

"(d) A statement as to whether the person nominated to be fiduciary has been convicted of a crime, has filed for or received protection under the bankruptcy laws or has had a license revoked or canceled that was required by the laws of any state for the practice of a profession or occupation. * * *

"(e) The name and address of any fiduciary that has been appointed for the respondent by a court of any state, any trustee for a trust established by or for the respondent, any person appointed as a health care representative * * * and any person acting as attorney-in-fact for the respondent under a power of attorney.

"(f) The name and address of the respondent's treating physician and any other person who is providing care to the respondent.

"(g) The factual information that supports the request for the appointment of a fiduciary or entry of other protective order, and the names and addresses of all persons who have information that would support a finding that an adult respondent is incapacitated or financially incapable.

"(h) A statement that indicates whether the nominated person intends to place the respondent in a mental health treatment facility, a nursing home or other residential facility.

"(i) A general description of the estate of the respondent and the respondent's sources of income and the amount of that income.

"(j) A statement indicating whether the person nominated as fiduciary is a public or private agency or organization that provides services to the respondent or an employee of a public or private agency or organization that provides services to the respondent."

[5] ORS 125.055(4) provides, in part, that, "if a petition seeks appointment of a conservator * * * who will exercise the powers of a conservator * * *, the petition must contain the petitioner's estimate of the value of the estate."

(2)(b) She stated what her interest was; (e) [S]he set forth the fact that she had a power of attorney. That was all."

Additionally, at the hearing, counsel for Grimmett asked the court to take judicial notice of the original petition for guardianship. The court, in response, took judicial notice of the entire court file. Brooks explains that

> "the original guardian petition was before the court, with its specific allegations under ORS 125.055 allegations about age, residence, interest, doctor, care providers, etc. The amended petition to add a request for conservator included the ORS 125.055(2)[(g)] 'factual information that supports the request for the appointment of a fiduciary * * *.' "

We hold that the original petition for guardianship, coupled with the amended petition for conservatorship, satisfies the statutory requirements of ORS 125.055(2) and (4). Therefore, we hold that the probate court did not err when it denied Grimmett's motion to dismiss for failure to state a claim or cause of action.

■ Grimmett's second assignment of error is that Brooks did not prove, by clear and convincing evidence, that Grimmett was financially incapable. Specifically, on appeal, Grimmett argues that "there was almost a total failure" to offer evidence to fulfill the requirements of ORS 125.055(3)[6] and (4).

We disagree. ORS 125.055(4) refers to the requirements for the petition for appointment of conservator and, as we have already explained above, Brooks fulfilled the requirements set out in that statute for such a petition. Furthermore, ORS 125.055(3) refers to the requirements for

---

[6] ORS 125.055(3) provides, in part:

"[I]f a petition seeks appointment of a guardian, the petition must contain a statement on whether the guardian will exercise any control over the estate of the respondent. If the guardian will exercise any control over the estate of the respondent, the petition must contain a statement of the monthly income of the respondent, the sources of the respondent's income, and the amount of any moneys that the guardian will be holding for the respondent at the time of the appointment. If the petition seeks the appointment of a guardian for an adult respondent * * * the petition must contain a statement notifying the court that a visitor must be appointed."

a petition for the appointment of a guardian, which does not concern this case.

Grimmett also argues that she is not financially incapable because

"[m]any seriously impaired people are able to meet their own needs, with assistance, so long as they remain within their accustomed routine. The fact that a person requires assistance in meeting [her] needs is not evidence of [an] inability to meet those needs, so long as that assistance remains available to [her]."

While Grimmett's assertion may be correct, we hold that Grimmett does not fit into the category of seriously impaired people who are able to meet their own needs and that Grimmett is, in fact, financially incapable.

ORS 125.400 provides, in part:

"Upon the filing of a petition seeking the appointment of a conservator, the court may appoint a conservator * * * if the court finds by clear and convincing evidence that the respondent is * * * financially incapable, and that the respondent has money or property that requires management or protection."

ORS 125.005(3) defines "financially incapable" as

"a condition in which a person is unable to manage financial resources of the person effectively for reasons including, but not limited to, mental illness, mental deficiency, physical illness or disability, chronic use of drugs or controlled substances, chronic intoxication, confinement, detention by a foreign power or disappearance. 'Manage financial resources' means those actions necessary to obtain, administer and dispose of real and personal property, intangible property, business property, benefits and income."

We hold that there was clear and convincing evidence before the probate court of Grimmett's inability to manage her financial resources. Furthermore, we hold that Grimmett cannot take actions "necessary to obtain, administer and dispose of real and personal property, intangible property * * * benefits and income." Brooks obtained letters from two physicians saying that Grimmett cannot handle her own affairs, possibly due to dementia; Davis said that

Grimmett needs assistance with her finances and in her apartment; Grimmett refuses her medication at West Hills, despite assistance; and Grimmett herself acknowledged that she cannot "keep up with money." Additionally, Brooks, staff members at West Hills, and Grimmett's financial advisor all believe that Grimmett's memory is poor. At one point, Grimmett forgot to turn off her stove, the fire department had to be called, and, at the fire department's request, the power to Grimmett's stove was turned off (Grimmett has since forgotten the incident). Grimmett also has a pattern of writing checks without sufficient funds to cover the checks. At one point, she wrote a check to West Hills for $1 million. She could not recall the year she retired, the name of the university where she received her master's degree, where she lives, or any of the estate planning that she did with SeRine. She also could not recall the name of Davis—the person that she named in her documents to replace Brooks. Grimmett did not know anything about her Social Security checks or her long term care insurance. She did not recall the names of her banks or whether she has any investments. She did not remember whether she receives a monthly check from the university or the amount of the check. She also could not remember that her accounts are held in a living trust. Grimmett further could not recall *how* she receives her bills from West Hills or whether she receives any other bills.

The way in which Grimmett's relationship with Brooks has changed is further evidence of mental illness or deficiency. At one point, Brooks was the sole beneficiary of Grimmett's estate. Now, Grimmett yells and swears at Brooks and will have nothing to do with her. Both SeRine and Brooks said that, while in Indiana, Grimmett was not taking care of herself and not paying bills. In fact, Brooks went to Indiana several times to pay Grimmett's house payments because they were not current, to take Grimmett to the doctor's office because Grimmett had missed her doctor's appointments, and to process the documentation to initiate Grimmett's retirement benefits.

In her brief, Grimmett argues that, even though she "did not have total recall of the events occurring involving her life for the past 70 years, she was able[,] with the assistance of notes, to identify all of her properties and sources of

income." Grimmett mischaracterizes her ability to explain her financial affairs to the probate court. At the beginning of the conservatorship hearing on November 15, 2001, Grimmett had tremendous difficulty recalling her assets and explaining her finances. At the continuation of the conservatorship hearing on January 10, 2002, Grimmett recalled more information about her finances than she had previously; however, Grimmett remained unable to recall the university from which she received her master's degree and the year that she retired. Additionally, Grimmett conceded that she "can't keep up with money."

In sum, for the reasons outlined above, the trial court did not err when it held that there is clear and convincing evidence that Grimmett is financially incapable and has money or property that requires management or protection under ORS 125.400.

■        We turn now to Grimmett's third assignment of error. She asserts that "[t]he court abused its discretion in failing to take into account" her wishes when it appointed a conservator.

ORS 125.200 provides, in part:

> "The court shall appoint *the most suitable person* who is willing to serve as fiduciary[7] after *giving consideration* to the specific circumstances of the respondent, any stated desire of the respondent, * * * the estate of the respondent *and any impact on ease of administration that may result from the appointment*."

(Emphasis added.)

ORS 125.200 provides only that the court may appoint the most suitable person as a fiduciary after *giving consideration to* the wishes of the respondent. There is no evidence that the probate court did not give consideration to Grimmett's wishes. The record supports the probate court's holding that Brooks is the most suitable person willing to serve as Grimmett's conservator in light of the fact of

---

[7] ORS 125.005(2) defines "fiduciary" as "a guardian or conservator appointed under the provisions of this chapter or any other person appointed by a court to assume duties with respect to a protected person under the provisions of this chapter."

Brooks's knowledge of Grimmett's finances, that Grimmett and Brooks once had a close relationship, and the fact that Grimmett had previously named Brooks as conservator in her estate planning documents. Brooks also testified that she understands that the court will review her actions as conservator and that she will work with an accountant to ensure that Grimmett and Grimmett's assets are fully protected.

Nonetheless, Grimmett cites *Driscoll v. Jewell*, 37 Or App 529, 533, 588 P2d 49 (1978), as support for her argument that the probate court did not take Grimmett's wishes into account when it appointed Brooks as Grimmett's conservator. In *Driscoll*, we stated that, "[g]iven the delicate nature of the proceedings, the wishes and desires of the protected person, *while certainly not binding upon the court*, should be accorded as much deference as possible." *Id.* at 533 (emphasis added).

Grimmett also cites *Shaw v. Christoffersen*, 190 Or 279, 223 P2d 1039 (1950), in support of her argument that the trial court should not have acted contrary to Grimmett's wishes by appointing Brooks as conservator. In *Shaw*, the Supreme Court stated that "[g]enerally, *the court has a reasonable discretion * * * and may appoint such person as guardian *as it deems most suitable and proper.*" *Id.* at 284 (emphasis added). The court also stated that "[t]he court should *consider* the suggestions or recommendations of persons interested in the proceedings, including those of the [protected person] * * *." *Id.* (emphasis added; internal quotation marks omitted). Additionally, *"[t]he conclusion at which the trial court arrived in the exercise of its discretion is entitled to great weight on appeal." Id.* (emphasis added). Therefore, *Driscoll* and *Shaw* support the decision of the probate court in this case.

Grimmett further argues that the court should have appointed Davis as conservator because Davis was suitable and Grimmett preferred Davis.

In response, Brooks argues that

"[t]he trial court cannot appoint a person as conservator without a cross-petition for appointment of that person, and statutory prerequisites met including notice to interested

> parties. A cross[-]petition for appointment of [Davis] as conservator was never filed in this case, and the court consequently lacked the authority to do as [Grimmett] argues: appoint a nonparty as conservator. *Spady v. Hawkins,* 155 Or App 454, 963 P2d 125 (1998)."

We agree that, under *Spady,* the probate court did not err when it refused to appoint Davis as conservator because Grimmett had not filed the appropriate cross-petition.

This court, on *de novo* review, however, may reverse the probate court's order appointing Brooks as conservator. Grimmett argues that we should, in fact, reverse Brooks's appointment as conservator. At oral argument, Grimmett's counsel said that Grimmett would be satisfied if we remanded this case to the probate court so that an independent conservator could be appointed. Grimmett argues that Brooks is unsuitable because "[t]here was and is a conflict of interest between [Brooks] and [Grimmett]. This arises out of the fact that [Brooks] claims that the transfer of stock to her by [Grimmett] * * * was a gift."

However, the record is not clear as to whether Grimmett, in fact, believes that the transfer of stock was not a gift. At one point during the proceedings, Grimmett stated that she did not remember giving the stock to Brooks, "but that doesn't mean that I didn't give it to her." Grimmett also was shown her tax reports and Brooks's tax reports, documenting a gift of stock. When she was shown the tax reports, Grimmett acknowledged that she had sent the forms to the IRS. Subsequently, however, at the January 10, 2002, continuation of the conservatorship hearing, Grimmett denied giving the stock to Brooks.

In her brief, Grimmett argues that, "at the time [Brooks] accepted the alleged gift[,] she had knowledge of two physician's reports which raised the question of whether [Grimmett] was 'financially incapable.'" The transfer of Grimmett's stock to Brooks occurred in June 2000. In April 2000, Brooks received letters from two physicians stating that Grimmett was not capable of handling her own affairs. Essentially, Grimmett argues that, because Brooks obtained letters from physicians stating that Grimmett was not capable of handling her own affairs, Brooks should not have

accepted the alleged gift because, presumably, Grimmett was incapable of conducting such a transfer.[8]

We disagree with Grimmett's characterization of the issue presented by the transfer of stock. The issue is not whether there is a conflict of interest because no attorney-client relationship existed between Brooks and Grimmett. Rather, the issue presented is whether there was a breach of a fiduciary relationship between Brooks and Grimmett, or, in a more general sense, whether a breach of trust on the part of Brooks prevents Brooks from serving as Grimmett's conservator.

ORS 125.221 (2001)[9] provides, in part:

"(1)   * * * Before the person is employed, the fiduciary must provide the court with the following:

"(a)   A full and accurate disclosure of the pecuniary or financial interest of the fiduciary in the person.

"* * * * *

"(c)   A full and accurate disclosure of the anticipated costs to the estate in using the person to provide the services.

"(2)   * * * [T]he court may require additional disclosures for the purpose of assessing *whether the pecuniary or financial interest of the fiduciary could compromise or otherwise affect decisions made by the fiduciary in carrying out the duties of the fiduciary.*

"* * * * *

"(5)   A fiduciary has a pecuniary or financial interest in another person for the purposes of this section if the fiduciary, or any person related to, employed by or affiliated with the fiduciary has:

---

[8] Grimmett also argues that this court should

"take judicial notice by reference to the Oregon State Bar Membership Directory, 2003, which shows that appellant is and was a practicing attorney in the State of Oregon * * *. While she did not have an attorney/client relationship with respondent at the time of that alleged gift[,] she did have a fiduciary relationship * * *."

[9] In 2003, the legislature amended ORS 125.221. The judgment in this case, however, was entered before the effective date of the change. *See* Or Laws 2003, ch 392, § 1.

"* * * * *

"(c) Any financial involvement with the person.

"(6) A fiduciary has a pecuniary or financial interest in another person for the purposes of this section if the fiduciary, or any person related to, employed by or affiliated with the fiduciary, receives remuneration or any other financial benefit from the person, without regard to whether that remuneration or benefit is directly tied to the services provided to the fiduciary or protected person.

"(7) * * * a fiduciary has a pecuniary or financial interest in another person for the purposes of this section if the relationship between the fiduciary and other person is such that the relationship could compromise or otherwise affect decisions made by the fiduciary in carrying out the duties of the fiduciary."

(Emphasis added.)

ORS 125.221 does not forbid the probate court from holding, as it did in this case, that Brooks may serve as Grimmett's conservator despite the fact that there is a dispute about whether the transfer of stock was a gift. However, the question is whether, given that this court has *de novo* review and there is a dispute about the stock transfer, we should reverse the probate court's order appointing Brooks as conservator and remand so that the court may appoint an independent conservator. When counsel for Brooks was confronted with this question at oral argument, she responded that the appointment of an independent conservator would be a poor public policy choice. Specifically, counsel for Brooks explained that the goal of estate planning is to plan ahead for situations such as the one in this case and to avoid the disintegration of relationships that existed before the protected person became financially incapable. Additionally, counsel for Brooks explained, in this case, when Grimmett was financially capable, Grimmett and Brooks had a very strong relationship, as evidenced by the fact that Grimmett named Brooks as her successor trustee, power of attorney, guardian, conservator, and beneficiary. Counsel for Brooks argued that it would be a poor public policy decision for this court to prevent Brooks from serving as Grimmett's conservator because

it would destroy the plans that Grimmett had in place when she was capable of making such plans.

In her brief, Brooks argues that, in addition to upholding the ruling of the probate court, we should find, as Brooks argues that the probate court did, that the stock transfer was, in fact, a gift. Brooks points out that, during questioning, Grimmett conceded that, although she did not remember giving the stock to Brooks, "that doesn't mean I didn't give it to her." Furthermore, Brooks argues that she

> "disclosed the gift to [Grimmett's] attorney's (both her first attorney and the current attorney), to the independent CPA who did the accounting of her handling of [Grimmett's] funds at the request of [Grimmett's] first attorney, and that the gift was a matter she knew should be, and was, disclosed to the court."

Brooks further explains that it makes sense that Grimmett would have given the stock to Brooks, given that Brooks was the primary beneficiary of Grimmett's estate and that, at the time of the gift, Brooks had helped Grimmett extensively by flying to Indiana three times.

We first note that there is nothing to support Brooks's argument that the probate court found that the transfer of stock was a gift. The fact is that the probate court made no explicit findings regarding the transfer of stock. On *de novo* review, however, we find that the transfer of stock from Grimmett to Brooks was a gift. The evidence that Brooks cites in support of her argument that the stock was a gift is persuasive. Furthermore, our finding is supported by the fact that the gift was documented on the tax returns of both Grimmett and Brooks and by the fact that Grimmett's memory is poor.

Additionally, Grimmett does not argue that she was not competent to make a gift. Rather, she argues that she did not make a gift and that Brooks should not have received the gift in light of the information that Brooks had from the physicians regarding Grimmett's condition. Therefore, given Grimmett's implicit concession that she was competent, as well as our finding that the gift was intended, we hold that there is no breach of a fiduciary relationship.

For the above reasons, we affirm the probate court's holding that Brooks be appointed as Grimmett's conservator.

Affirmed.